

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 10, 2021

Benjamin Gruenstein, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10009

Re:  ***United States v. Rahn+Bodmer Co.*, 21 Cr. \_\_\_\_ 175 ( )**
**Deferred Prosecution Agreement**

Dear Mr. Gruenstein:

The United States Attorney's Office for the Southern District of New York (the "Office") and the Tax Division of the United States Department of Justice (the "Tax Division") (collectively, the "Department"), and the defendant Rahn+Bodmer Co. ("R+B"), under authority granted by its partners in the form of a Partnership Resolution (a copy of which is attached hereto as Exhibit A), hereby enter into this Deferred Prosecution Agreement (the "Agreement").

This Agreement shall take effect upon its execution by all parties.

## THE CRIMINAL INFORMATION

1.      R+B waives indictment and consents to the filing of a one-count Information (the "Information") in the United States District Court for the Southern District of New York (the "Court"), charging R+B with conspiring with others, including U.S. taxpayers, in violation of Title 18, United States Code, Section 371, (1) to defraud the United States and an agency thereof, to wit, the United States Internal Revenue Service (the "IRS"); (2) to file false federal income tax returns in violation of Title 26, United States Code, Section 7206(1); and (3) to evade federal income taxes in violation of Title 26, United States Code, Section 7201, for the period from 2004 to 2012.  A copy of the Information is attached hereto as Exhibit B.

## ACCEPTANCE OF RESPONSIBILITY

2.      R+B admits and stipulates that the facts set forth in the Statement of Facts, attached hereto as Exhibit C and incorporated herein, are true and accurate.  In sum, R+B admits that it is responsible under U.S. law for the federal criminal violations charged in the Information and set forth in the Statement of Facts as a result of the acts of its partners, officers, employees, and agents.

Page 2

## RESTITUTION, FORFEITURE, AND PENALTY OBLIGATIONS

3.       As a result of the conduct described in the Information and the Statement of Facts, R+B agrees to make payments in total of $22,000,000 to the United States.  Specifically, R+B agrees to (1) make a payment of restitution in the amount of $4,900,000 (the "Restitution Amount"); (2) forfeit $9,700,000 (the "Forfeiture Amount") to the United States; and (3) pay a penalty of $7,400,000 (the "Penalty Amount") to the Department, as set forth below.

### Restitution

4.       In regard to the Restitution Amount, R+B admits and the Department agrees that the Restitution Amount represents the approximate gross pecuniary loss to the Internal Revenue Service as a result of the conduct described in the Statement of Facts.  The Restitution Amount shall not be further reduced by payments made to the Internal Revenue Service by U.S. taxpayers through the Offshore Voluntary Disclosure Initiative and similar programs (collectively, "OVDI") before or after the date of this Agreement that have not already been credited against the Restitution Amount.  R+B agrees to pay the Restitution Amount to the IRS by wire transfer within seven (7) days of the date of the Court's approval of deferral under the Speedy Trial Act in connection with this Agreement.  If R+B fails to timely make the payment required under this paragraph, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment, unless the Department, in its sole discretion, chooses to reinstate prosecution pursuant to Paragraphs 21 and 22, below.

### Forfeiture

5.       The Forfeiture Amount of $9,700,000 represents substitute res for the approximate gross fees paid to R+B by U.S. taxpayers with undeclared accounts at R+B from 2004 through 2012 that are subject to civil forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

6.       The Forfeiture Amount shall be sent by wire transfer to a seized asset deposit account maintained by the United States Department of the Treasury within seven (7) days of the Court's approval of deferral under the Speedy Trial Act in connection with this Agreement.  If R+B fails to timely make the payment required under this paragraph, interest (at the rate specified in 28 U.S.C. § 1961) shall accrue on the unpaid balance through the date of payment, unless the Department, in its sole discretion, chooses to reinstate prosecution pursuant to Paragraphs 21 and 22, below.

7.       Upon payment of the Forfeiture Amount, R+B shall release any and all claims it may have to such funds and execute such documents as necessary to accomplish the forfeiture of the funds.

8.       R+B agrees that this Agreement, the Information, and the Statement of Facts may be attached and incorporated into a civil forfeiture complaint (the "Civil Forfeiture Complaint"), a copy of which is attached hereto as Exhibit D, that will be filed against the Forfeiture Amount. By this Agreement, R+B expressly waives service of that Civil Forfeiture Complaint and agrees that a Judgment of Forfeiture may be entered against the Forfeiture Amount.  R+B also agrees that

the facts contained in the Information and Statement of Facts are sufficient to establish that the Forfeiture Amount is subject to civil forfeiture to the United States.

## Penalty

9.    The Department and R+B agree that, consistent with the factors set forth in U.S.S.G. § 8C2.8 and 18 U.S.C. §§ 3553(a) and 3572(a), and in light of the Forfeiture Amount and the Restitution Amount, the Penalty Amount of $7,400,000 is an appropriate penalty in this case.  This amount reflects a 55% discount for cooperation.  R+B agrees to pay the Penalty Amount as directed by the Department within seven (7) days of the Court's approval of deferral under the Speedy Trial Act in connection with this Agreement.  The Department and R+B agree that the Penalty Amount is appropriate given the facts and circumstances of this case, including the nature and seriousness of R+B's conduct as set forth in the Statement of Facts, and also, in mitigation of a higher penalty, among other things, the thorough internal investigation conducted by R+B and the provision of a substantial amount of documents to the Department.  The Department and R+B further agree that the Penalty Amount is final and shall not be refunded, that nothing in this Agreement shall be deemed an agreement by the Department that the Penalty Amount is the maximum penalty that may be imposed in any future prosecution, and that the Department is not precluded from arguing in any future prosecution that the Court should impose a higher penalty.

10.    R+B agrees that it will not file a claim or a petition for remission, restoration, or any other assertion of ownership or request for return relating to the Forfeiture Amount or the payment of the Penalty Amount described above, or any other action or motion seeking to collaterally attack the seizure, restraint, forfeiture, or conveyance of the Forfeiture Amount or the Penalty Amount, nor shall it assist any others in filing any such claims, petitions, actions, or motions.

## Non-Deductibility

11.    R+B agrees that the Restitution Amount, the Forfeiture Amount, and the Penalty Amount shall be treated as non-tax-deductible amounts paid to the United States Government for, if relevant, all tax purposes under United States law.  R+B agrees that it will not claim, assert, or apply for, either directly or indirectly, a tax deduction, tax credit, or any other offset with regard to any United States federal, state, or local tax, for any portion of the $22,000,000 that R+B has agreed to pay to the United States pursuant to this Agreement.

## TERM OF THE AGREEMENT

12.    R+B agrees that its obligations pursuant to this Agreement, which shall commence upon the signing of this Agreement, will continue for three years from the date of the Court's acceptance of this Agreement, unless otherwise extended pursuant to Paragraph 13 below (the "Deferral Period"), subject to the continuing cooperation obligations set forth in Paragraph 18 below.  R+B's obligation to cooperate is not intended to apply in the event that a prosecution against R+B by the Department is pursued and not deferred.

13.     R+B agrees that, in the event that the Department determines during the Deferral Period described in Paragraph 12 above (or any extensions thereof) that R+B has violated any provision of this Agreement, an extension of the period of the Deferral Period may be imposed in the sole discretion of the Department, up to an additional one year, but in no event shall the total term of the deferral-of-prosecution period of this Agreement exceed four years.

## DEFERRAL OF PROSECUTION

14.     R+B has made a commitment to:  (a) accept and acknowledge responsibility for its conduct, as described in the Statement of Facts and the Information attached hereto; (b) cooperate fully with the Department, the IRS, and any other law enforcement agency so designated by the Department; (c) make the payments specified in this Agreement; (d) comply with the federal criminal laws of the United States (as provided herein in Paragraph 16(e) and (g)); and (e) otherwise comply with all of the terms of this Agreement.  In consideration of the foregoing, the Department shall recommend to the Court that prosecution of R+B on the Information be deferred for three years.  R+B shall expressly waive indictment and all rights to a speedy trial pursuant to the Sixth Amendment of the United States Constitution, Title 18, United States Code, Section 3161, Federal Rule of Criminal Procedure 48(b), and any applicable Local Rules of the United States District Court for the Southern District of New York for the period during which this Agreement is in effect.

15.     The Department agrees that if R+B is in compliance with all of its obligations under this Agreement, the Department will, at the expiration of the Deferral Period (including any extensions thereof), seek dismissal with prejudice of the Information filed against R+B pursuant to this Agreement.  Except in the event of a violation by R+B of any term of this Agreement or as otherwise provided in Paragraph 21, the Department will bring no additional charges or other civil action against R+B relating to its conduct as described in the Information and the Statement of Facts attached hereto.  This Agreement does not provide any protection against prosecution for any crimes except as set forth above and does not apply to any individual or entity other than R+B. R+B and the Department understand that the Court must approve deferral under the Speedy Trial Act, in accordance with 18 U.S.C. § 3161(h)(2).  Should the Court decline to defer prosecution for any reason:  (a) both the Department and R+B are released from any obligation imposed upon them by this Agreement; (b) this Agreement shall be null and void, except for the tolling provision set forth in Paragraph 21, below; and (c) if they have already been transferred to the United States, the Restitution Amount, Forfeiture Amount and Penalty Amount shall be returned to R+B.

## CONTINUING COOPERATION

16.     During the Deferral Period, R+B shall cooperate fully, subject to applicable laws and regulations, with the Department, the IRS, and any other federal law enforcement agency designated by the Department regarding all matters related to the Department's investigation into U.S.-related accounts banking at R+B (the "Department's Investigation") about which R+B has information or knowledge, including:

(a)     truthfully and completely disclose all information with respect to the activities of R+B, its partners, officers, and employees, and others concerning all such matters

about which the Department inquires related to the Department's Investigation, which information can be used for any purpose, except as limited by this Agreement or by applicable law;

(b)      specifically provide, upon request, all items, assistance, information and documents required to be produced by Swiss banks participating in the Program for Non-Prosecution Agreements or Non-Target Letters for Swiss Banks (the "Swiss Bank Program") as set forth specifically in Parts II.D.1(a)-(d) and 2 of the Program;

(c)      provide, as soon as practicable, transaction information called for by Part II.D.2.b.vi of the Swiss Bank Program, to include accounts closed in the period from January 1, 2009 through December 31, 2019, in the format requested by the Department in the Swiss Bank Program;

(d)      make reasonable efforts to implement the closure of recalcitrant accounts and related procedures, to the extent that it has not already done so, as set forth in Part II.G of the Swiss Bank Program and as otherwise consistent with Swiss law;

(e)      truthfully and completely disclose, and continue to disclose during the Deferral Period, consistent with applicable law and regulations, all information described in Part II.D.1 of the Swiss Bank Program with respect to U.S. Related Accounts held by R+B from 2004 through 2012 (as those terms are defined in the Program) that is not protected by a valid claim of privilege or work product with respect to the activities of R+B and its partners, officers, employees, agents, consultants, and others, which information can be used for any purpose, except as otherwise limited in this Agreement.  Subject to applicable laws and regulations, R+B shall disclose to the Department that it has discovered new information required to be disclosed under this Agreement, including pursuant to this paragraph and Paragraph 16(b) and (c), no later than thirty days from discovery and provide such information, including information as described in Part II.D.1 of the Program and information pursuant to Paragraph 16(b) and (c) of this Agreement, no later than ninety days from discovery.  All other terms of this Agreement shall apply with respect to any newly disclosed account;

(f)      provide all necessary information and assist the United States with the drafting of treaty requests to seek account records and other information, and will collect and maintain all records that are potentially responsive to such treaty requests to facilitate prompt responses; and

(g)      R+B shall commit no violations of the federal criminal laws of the United States.

17.      It is further understood that during the Deferral Period, R+B will bring, consistent with applicable laws or regulations, to the Department's attention: (a) all criminal conduct by, and criminal investigations of R+B or its partners, officers, and employees related to any violations of the laws of the United States that come to the attention of R+B's partners or senior management, and (b) any investigation conducted by, or any civil, administrative, or regulatory proceeding brought by, any U.S. governmental authority that alleges fraud by R+B or any other violations of the federal laws of the United States in the operation or management of R+B's business.

18.     Notwithstanding the Deferral Period, R+B shall also, subject to applicable laws or regulations, continue to cooperate with the Department, the IRS, and any other federal law enforcement agency designated by the Department regarding any and all matters related to the Department's Investigation until the date on which all civil or criminal examinations, investigations, or proceedings, including all appeals, are concluded, whether or not those examinations, investigations, or proceedings are concluded within the Deferral Period, including:

(a)     cooperate fully with the Department, the IRS, and any other federal law enforcement agency designated by the Department regarding all matters related to the Department's Investigation;

(b)     retain all records relating to the Department's Investigation, for a period of ten years from the end of the Deferral Period;

(c)     provide all necessary information and assist the United States with the drafting of treaty requests seeking account information for accounts owned and/or controlled by U.S. persons, and collect and maintain all records that are potentially responsive to such treaty requests in order to facilitate a prompt response;

(d)     assist the Department or any designated federal law enforcement agency in any investigation, prosecution, or civil proceeding arising out of or related to the Department's Investigation by providing logistical and technical support for any meeting, interview, grand jury proceeding, or any trial or other court proceeding;

(e)     use its best efforts promptly to secure the attendance and truthful statements or testimony or information of any current or former officer, director, employee, agent, or consultant of R+B at any meeting or interview or before any grand jury or at any trial or other court proceeding regarding matters arising out of or related to the Department's Investigation;

(f)     provide testimony of a competent witness as needed to enable the Department and any designated federal law enforcement agency to use the information and evidence obtained pursuant to R+B's cooperation with the Department before a grand jury or at any trial or other court proceeding regarding matters arising out of or related to the Department's Investigation;

(g)     provide the Department, upon request, consistent with applicable law and regulations, all information, documents, records, or other tangible evidence not protected by a valid claim of privilege or work product regarding matters arising out of or related to the Department's Investigation about which the Department or any designated federal law enforcement agency inquires;

(h)     upon request, provide fair and accurate translations, at R+B's expense, of any foreign language documents produced by R+B to the Government either directly or through any government entity; and

(i)     provide to any state law enforcement agency such assistance as may reasonably be requested in order to establish the basis for admission into evidence of documents already in the possession of such state law enforcement agency in connection with any state civil or criminal tax proceedings brought by such state law enforcement agency against an individual arising out of or related to the Department's Investigation.

19.     R+B agrees to use best efforts to close, as soon as practicable, and in no event later than the end of the Deferral Period, all accounts owned and/or controlled by U.S. persons that have been classified as "dormant" in accordance with applicable laws, regulations and guidelines, and will provide periodic reporting upon request of the Office if unable to close any dormant accounts within that time period. R+B will only provide banking or securities services in connection with any such "dormant" account to the extent that such services are required pursuant to applicable laws, regulations and guidelines. If at any point contact with the account holder(s) (or other persons(s) with authority over the account) is re-established, R+B will promptly proceed to follow the procedures described above in Paragraph 16(d).

20.     Nothing in this Agreement shall require R+B to waive any protections of the attorney-client privilege, attorney work-product doctrine, or any other applicable privilege unless R+B voluntarily chooses to waive any such privilege.  Nothing in this Agreement shall require R+B to violate the law of any jurisdiction in which it operates.

## BREACH OF THE AGREEMENT

21.     It is understood that should the Department in its sole discretion determine during the Deferral Period that R+B:  (a) has knowingly given materially false, incomplete or misleading information either during the Deferral Period or in connection with the Department's Investigation of the conduct described in the Information or Statement of Facts; (b) committed any crime under the federal laws of the United States subsequent to the execution of this Agreement; or (c) otherwise knowingly violated any provision of this Agreement, R+B shall, in the Department's sole discretion, thereafter be subject to prosecution for any federal criminal violation, or suit for any civil cause of action, including but not limited to a prosecution or civil action based on the Information, the Statement of Facts, the conduct described therein, or perjury and obstruction of justice.  Any such prosecution or civil action may be premised on any information provided by or on behalf of R+B to the Department or the IRS at any time.  In any prosecution or civil action based on the Information, the Statement of Facts, or the conduct described therein, it is understood that: (a) no charge would be time-barred provided that such prosecution is brought within the applicable statute of limitations period (subject to any prior tolling agreements between the Department and R+B), and excluding the period from the execution of this Agreement until its termination; and (b) R+B agrees to toll, and exclude from any calculation of time, the running of the statute of limitations for the length of this Agreement starting from the date of the execution of this Agreement and including any extension of the period of deferral of prosecution pursuant to Paragraph 13 above.  By this Agreement, R+B expressly intends to and hereby does waive its rights in the foregoing respects, including any right to make a claim premised on the statute of limitations, as well as any constitutional, statutory, or other claim concerning pre-indictment delay. Such waivers are knowing, voluntary, and in express reliance on the advice of R+B's counsel.

Page 8

22.    It is further agreed that in the event that the Department, in its sole discretion, determines that R+B has knowingly violated any provision of this Agreement, including by failure to meet its obligations under this Agreement:  (a) all statements made by or on behalf of R+B to the Department, or the IRS, including but not limited to the Statement of Facts, or any testimony given by R+B or by any agent of R+B before a grand jury, or elsewhere, whether before or after the date of this Agreement, or any leads from such statements or testimony, shall be admissible in evidence in any and all criminal proceedings hereinafter brought by the Department against R+B; and (b) R+B shall not assert any claim under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule, that statements made by or on behalf of R+B before or after the date of this Agreement, or any leads derived therefrom, should be suppressed or otherwise excluded from evidence.  It is the intent of this Agreement to waive any and all rights in the foregoing respects.

23.    R+B, having admitted to the facts in the Statement of Facts, agrees that it shall not, through its attorneys, agents, or employees, make any public statement, in litigation or otherwise, contradicting the Statement of Facts or its representations, agreements and stipulations in this Agreement.  Any such contradictory statement by R+B, through its present or future attorneys, partners, agents, or employees authorized to speak on behalf of R+B, shall constitute a violation of this Agreement, and R+B thereafter shall be subject to prosecution as specified in Paragraphs 21 and 22, above, or the Deferral Period shall be extended pursuant to Paragraph 13, above.  The decision as to whether any such contradictory statement will be imputed to R+B for the purpose of determining whether R+B has violated this Agreement shall be within the sole discretion of the Department.  Upon the Department's notifying R+B of any such contradictory statement, R+B may avoid a finding of violation of this Agreement by repudiating such statement both to the recipient of such statement and to the Department within 48 hours after having been provided notice by the Department.  R+B consents to the public release by the Department, in its sole discretion, of any such repudiation.  The Department agrees that nothing in this Agreement in any way prevents R+B or its partners from taking good-faith positions, raising defenses, or asserting affirmative claims that are not inconsistent with the Statement of Facts in any civil proceedings, investigations, or litigation involving private parties or government entities, including non-U.S. litigations or non-U.S. investigations.  Nothing in this Agreement is meant to affect the obligation of R+B or its partners, officers, directors, agents or employees to testify truthfully to the best of their personal knowledge and belief in any proceeding.

24.    R+B agrees that it is within the Department's sole discretion to choose, in the event of a violation, the remedies contained in Paragraphs 21 and 22, above, or instead to choose to extend the period of deferral of prosecution pursuant to Paragraph 13.  R+B understands and agrees that the exercise of the Department's discretion under this Agreement is unreviewable by any court.  Should the Department determine that R+B has violated this Agreement, the Department shall provide prompt written notice to R+B of that determination and provide R+B with a 30-day period from the date of receipt of notice in which to make a presentation to the Department to demonstrate that no violation occurred, or, to the extent applicable, that the violation should not result in the exercise of those remedies or in an extension of the period of deferral of prosecution, including because the violation has been cured by R+B.

## ADDITIONAL PROVISIONS

### Limits of the Agreement

25.     It is understood that this Agreement is binding on the Office and the Tax Division, but does not bind any other components of the Department of Justice, any other Federal agencies, any state or local law enforcement agencies, any licensing authorities, or any regulatory authorities.  However, if requested by R+B or its attorneys, the Department will bring to the attention of any such agencies, including but not limited to any regulators, as applicable, this Agreement, the cooperation of R+B, and R+B's compliance with its obligations under this Agreement.

### Public Filing

26.     The Department and R+B agree that, upon the submission of this Agreement (including the Statement of Facts and other attachments) to the Court, this Agreement and its attachments shall be filed publicly in the proceedings in the United States District Court for the Southern District of New York.

27.     The parties understand that this Agreement reflects the special facts of this case and is not intended as precedent for other cases.

### Execution in Counterparts

28.     This Agreement may be executed in one or more counterparts, each of which shall be considered effective as an original signature.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

## Integration Clause

29.    This Agreement sets forth all the terms of the Deferred Prosecution Agreement between R+B and the Department.  This Agreement supersedes all prior understandings or promises between the Department and R+B.  No modifications or additions to this Agreement shall be valid unless they are in writing and signed by the Office, the Tax Division, R+B's attorneys, and a duly authorized representative of R+B.

Dated: New York, New York
        February 10, 2021

Very truly yours,

AUDREY STRAUSS
United States Attorney


By: _____
     Olga I. Zverovich
     Assistant United States Attorney
     (212) 637-2514

APPROVED:


_____
Laura Grossfield Birger
Chief, Criminal Division



STUART M. GOLDBERG
Acting Deputy Assistant Attorney General
for Criminal Matters, Tax Division

By: _____
     Ellen M. Quattrucci
     Trial Attorney
     (202) 514-9370

Page 11

ACCEPTED AND AGREED TO:

_____
Peter R. Rahn
Partner
Rahn+Bodmer Co.

2 / 11 / 2021
_____
Date

_____
Martin H. Bidermann
Partner
Rahn+Bodmer Co.

2 / 11 / 2021
_____
Date

_____
Dr. Christian Rahn
Partner
Rahn+Bodmer Co.

2 / 11 / 2021
_____
Date

_____
André M. Bodmer
Partner
Rahn+Bodmer Co.

2/ 11/ 2021
_____
Date

_____
Christian R. Bidermann
Partner
Rahn+Bodmer Co.

2/ 11/2021
_____
Date

_____
Benjamin Gruenstein, Esq.
Cravath, Swaine & Moore LLP
Attorney for Rahn+Bodmer Co.

2/19/21
_____
Date

Page 12

Pursuant to 18 U.S.C. § 3161(h)(2), exclusion under the Speedy Trial Act of the period of time during which the prosecution of the defendant Rahn+Bodmer Co. is deferred pursuant to this Agreement is hereby approved.

Dated: March 11, 2021
      New York, New York

**SO ORDERED:**

United States District Judge
Southern District of New York

# Exhibit A

EXHIBIT A TO DEFERRED PROSECUTION AGREEMENT

CERTIFICATE OF RESOLUTION OF THE PARTNERS OF RAHN+BODMER CO.

SWITZERLAND

I, Christian Rahn, Partner of Rahn+Bodmer Co. (the Bank), a partnership duly organized and existing under the laws of Switzerland, do hereby certify that the following is a complete and accurate copy of a resolution considered and adopted by the Partners of the Bank on February 11, 2021:

- That the Partners have (i) reviewed the entire Deferred Prosecution Agreement to which this Certificate is attached as Exhibit A, including the Statement of Facts attached to the Deferred Prosecution Agreement as Exhibit C; (ii) consulted with Swiss and U.S. counsel in connection with this matter; and (iii) unanimously voted to enter into the Deferred Prosecution Agreement, including to pay a sum of USD 22'000'000 to the U.S. Department of Justice in connection with the Deferred Prosecution Agreement; and
- That Christian Rahn, one of the Bank's Partners, registered in the Commercial register of the Canton of Zurich as having individual signatory authority, is hereby authorized (i) to execute the Deferred Prosecution Agreement on behalf of the Bank, substantially in such form as reviewed by the Partners with such non-material changes as each of them may approve; and (ii) to take, on behalf of the Bank, all actions as may be necessary or advisable in order to carry out the foregoing; and
- That Benjamin Gruenstein, Cravath Swaine & Moore LLP is hereby authorized to sign the Deferred Prosecution Agreement in his capacity as the Bank's U.S. counsel.

I further certify that the above resolution has not been amended or revoked in any respect and remains in full force and effect.

In witness whereof, I have executed this Certificate this 11th day of February 2021

Dr. Christian Rahn, Partner

RESOLUTION OF THE PARTNERS OF RAHN+BODMER CO.

SWITZERLAND

We, Peter Rahn, Martin Bidermann, Christian Rahn, André Bodmer and Christian Bidermann, Partners of Rahn+Bodmer Co. (the Bank), a partnership duly organized and existing under the laws of Switzerland, on February 11, 2021 resolved the following:

- That the Partners have (i) reviewed the entire Deferred Prosecution Agreement to which a Certificate of this Resolution will be attached as Exhibit A, including the Statement of Facts attached to the Deferred Prosecution Agreement as Exhibit C; (ii) consulted with Swiss and U.S. counsel in connection with this matter; and (iii) unanimously voted to enter into the Deferred Prosecution Agreement, including to pay a sum of USD 22'000'000 to the U.S. Department of Justice in connection with the Deferred Prosecution Agreement; and
- That Christian Rahn, one of the Bank's Partners, registered in the Commercial register of the Canton of Zurich as having individual signatory authority, is hereby authorized (i) to execute the Deferred Prosecution Agreement on behalf of the Bank, substantially in such form as reviewed by the Partners with such non-material changes as each of them may approve; and (ii) to take, on behalf of the Bank, all actions as may be necessary or advisable in order to carry out the foregoing; and
- That Benjamin Gruenstein, Cravath Swaine & Moore LLP are hereby authorized to sign the Deferred Prosecution Agreement in their capacity as the Bank's U.S. counsel.

This 11th day of February 2021

Peter R. Rahn, Partner

Martin H. Bidermann, Partner

Dr. Christian Rahn, Partner

André M. Bodmer, Partner

Christian R. Bidermann, Partner

Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x
                           :

  UNITED STATES OF AMERICA

                           :    <u>INFORMATION</u>
        - v. -
                           :    21 Cr.

  RAHN+BODMER CO.,

                           :

          Defendant.   :

- - - - - - - - - - - - - - - x

### COUNT ONE
(Conspiracy)

The United States Attorney charges:

### Rahn+Bodmer Co.

1.  At all times relevant to this Information:

a.  RAHN+BODMER CO. ("R+B"), the defendant, was a private bank located in Switzerland that provided private banking, asset management, and other services to individuals and entities around the world, including U.S. taxpayers in the Southern District of New York.

b.  R+B was structured as a partnership, which included five general partners who had both managerial and client service responsibilities (the "General Partners").

c.  R+B employed client advisors, who provided advice to, and opened and maintained accounts for, clients of

R+B.

## Obligations of U.S. Taxpayers
## With Respect to Foreign Financial Accounts

2.   At all times relevant to this Information:

a.   U.S. citizens and residents who had income in any one calendar year in excess of a threshold amount ("U.S. taxpayers") were required to file a U.S. Individual Income Tax Return, Form 1040 ("Form 1040"), for that calendar year with the Internal Revenue Service ("IRS").  On the Form 1040, U.S. taxpayers were obligated to report their worldwide income, including income earned in foreign bank accounts.

b.   U.S. taxpayers also had an obligation to report to the IRS on Schedule B of the Form 1040 whether they had a financial interest in, or signature authority over, a financial account in a foreign country during the relevant calendar year by checking "Yes" or "No" in the appropriate box and identifying the country where such account was maintained.

c.   In addition, U.S. taxpayers who had a financial interest in, or signature or other authority over, one or more financial accounts in a foreign country with an aggregate value of more than $10,000 at any time during a particular calendar year were required to file with the Department of Treasury a Report of Foreign Bank and Financial

2

Accounts, FinCEN Form 114 (the "FBAR," formerly known as Form TD F 90-22.1) on or before June 30 of the following year.  In general, the FBAR required that the U.S. taxpayer filing the form identify the financial institution with which the financial account was held, the type of account (either bank, securities, or other), the account number, and the maximum value of the account during the calendar year for which the FBAR was being filed.

        d.    The regulations relating to the required disclosure of foreign bank accounts specifically precluded U.S. taxpayers from having foreign accounts nominally held by sham corporate structures as a means of avoiding disclosure. Specifically, as set forth in Title 31, Code of Federal Regulations, Section 1010.350(e)(3):

> A United States person that causes an entity, including but not limited to a corporation, partnership, or trust, to be created for a purpose of evading this section [requiring generally the disclosure of offshore financial accounts containing over $10,000 and over which a U.S. taxpayer has signature or other authority] shall have a financial interest in any bank, securities, or other financial account in a foreign country for which the entity is the owner of record or holder of legal title.

        3.    As used in this Information, "undeclared account" refers to a financial account held or beneficially owned by an individual subject to U.S. tax and maintained in a foreign

3

country that has not been reported by the individual account holder or beneficial owner to the U.S. government on a Form 1040 or FBAR as required.

## Overview of the Conspiracy

4.   From at least in or about 2004 up through and including in or about 2012, numerous U.S. taxpayer-clients conspired with R+B, the defendant, and others known and unknown, to defraud the United States, to conceal from the IRS the existence of bank accounts held by U.S. taxpayer-clients at R+B and the income earned in these accounts, to file false tax returns, and to evade U.S. taxes on income generated in the undeclared accounts.  At its peak in or around 2007, R+B conspired with U.S. taxpayer-clients to hide approximately $550 million in assets from the IRS in accounts at R+B.

## Means and Methods of the Conspiracy

5.   Among the means and methods by which R+B, the defendant, and its co-conspirators carried out the conspiracy were the following:

a.   R+B opened and managed for U.S. taxpayer-clients accounts at R+B that were not reported to the IRS on Forms 1040, FBARs, or otherwise, and the income from which was also not reported to the IRS.

b.   R+B opened and maintained "numbered" or

4

"pseudonym" accounts for numerous U.S. taxpayer-clients to ensure that the U.S. taxpayer-clients' names would not appear on bank documents relating to their accounts and thereby reduce the risk that U.S. tax authorities would learn the identities of the U.S. taxpayer-clients.

c.   R+B assisted U.S. taxpayer-clients in opening and maintaining undeclared accounts held in the name of sham entities, that is, structures that had no business purpose, in order to conceal the U.S. taxpayer-clients' beneficial ownership of the account assets.

d.   R+B agreed to hold bank statements and other records relating to accounts of U.S. taxpayer-clients, rather than send them to the U.S. taxpayer-clients in the United States, which helped ensure that documents reflecting the existence of the accounts remained outside the United States and beyond the reach of U.S. tax authorities.

e.   R+B allowed U.S. taxpayer-clients and third-party asset managers to make structured withdrawals by checks from undeclared accounts in amounts of less than $10,000, in an attempt to conceal transactions from U.S. authorities.

f.   R+B offered its clients stored-value debit cards issued by an independent service provider, which allowed U.S. taxpayer-clients to use the funds in their undeclared

accounts at R+B.

g.   R+B permitted several U.S. taxpayer-clients to make deposits into undeclared accounts through intermediaries.

h.   After Liechtenstein and the United States signed a Tax Information Exchange Treaty ("TIEA"), under which Liechtenstein agreed to provide the United States with access to certain bank and other information needed to enforce U.S. tax laws, R+B transferred undeclared assets of several U.S. taxpayer-clients from accounts held in the names of sham foundations organized under the laws of Liechtenstein to new accounts held in the names of new sham foundations organized under the laws of Panama in an effort to further conceal the U.S. taxpayer-accounts.

i.   Following the February 2009 public announcement of the deferred prosecution agreement between UBS AG ("UBS"), another Swiss bank, and the United States Department of Justice, and the fact that Liechtenstein would provide account records to the IRS, R+B opened sham "escrow accounts" that facilitated the transfer of undeclared assets of U.S. taxpayer-clients that had been converted to gold and other precious metals, to a vault at UBS.  R+B opened the escrow accounts on behalf of Edgar Paltzer ("Paltzer"), a Swiss

6

attorney and co-conspirator not named as a defendant herein.

   j. On occasion, R+B opened accounts for U.S. taxpayer-clients who were exiting UBS and other Swiss banks, and allowed these U.S. taxpayer-clients to continue to conceal their undeclared assets at R+B.

   k. R+B helped U.S. taxpayer-clients to repatriate funds to the United States in a manner designed to ensure that U.S. authorities did not discover these undeclared accounts.

   l. R+B, through a General Partner and a client advisor, made regular visits to the United States to solicit, open, and service undeclared accounts of U.S taxpayer-clients.

   m. Various U.S. taxpayer-clients of R+B, including taxpayer-clients in New York, New York, filed false Forms 1040 that failed to report their interest in, and income earned from, their undeclared R+B accounts; evaded income taxes due and owing; and failed to file FBARs identifying their undeclared accounts.

## Statutory Allegations

   6. From at least in or about 2004 up through and including in or about 2012, in the Southern District of New York and elsewhere, R+B, the defendant, together with others known and unknown, willfully and knowingly did combine, conspire,

confederate, and agree together and with each other to defraud
the United States of America and an agency thereof, to wit, the
IRS, and to commit offenses against the United States, to wit,
violations of Title 26, United States Code, Sections 7206(1) and
7201.

      7.   It was a part and an object of the conspiracy
that R+B, the defendant, together with others known and unknown,
willfully and knowingly would and did defraud the United States
of America and the IRS for the purpose of impeding, impairing,
obstructing, and defeating the lawful governmental functions of
the IRS in the ascertainment, computation, assessment, and
collection of revenue, to wit, federal income taxes.

      8.   It was further a part and an object of the
conspiracy that various U.S. taxpayer-clients of R+B, the
defendant, together with others known and unknown, willfully and
knowingly would and did make and subscribe returns, statements,
and other documents, which contained and were verified by
written declarations that they were made under the penalties of
perjury, and which these U.S. taxpayer-clients, together with
others known and unknown, did not believe to be true and correct
as to every material matter, in violation of Title 26, United
States Code, Section 7206(1).

      9.   It was further a part and an object of the

conspiracy that R+B, the defendant, together with others known and unknown, willfully and knowingly would and did attempt to evade and defeat a substantial part of the income tax due and owing to the United States of America by certain of R+B's U.S. taxpayer-clients, in violation of Title 26, United States Code, Section 7201.

## Overt Acts

10.   In furtherance of the conspiracy and to effect the illegal objects thereof, R+B, the defendant, and others known and unknown, including R+B General Partners and client advisors acting within the scope of their employment with R+B, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.   On multiple occasions until in or about 2007, an R+B General Partner (the "R+B General Partner") met with a U.S. taxpayer-client in Delray Beach, Florida and New York, New York, to discuss the U.S. taxpayer-client's undeclared account at R+B and to review account statements related to the account.

b.   On or about August 24, 2007, Martin Dunki ("Dunki"), a R+B client advisor and co-conspirator not named as a defendant herein, and Paltzer, at the request of a U.S. taxpayer-client, arranged to transfer approximately $100,000

9

from an undeclared account held by the U.S. taxpayer-client at R+B to a diamond dealer in New York, New York.

c.    On or about December 18, 2008, Dunki arranged to transfer the undeclared assets of two U.S. taxpayer-clients of R+B from an account at R+B held by a sham Liechtenstein foundation to a new account held at R+B by a sham Panamanian foundation.

d.    On or about April 29, 2009, the R+B General Partner, a U.S. taxpayer-client of R+B, and Paltzer, met in Switzerland (the "April 2009 Meeting") to discuss the future of the U.S. taxpayer-client's undeclared account at R+B in light of the public news that UBS had been investigated by United States law enforcement authorities for helping U.S. taxpayers maintain undeclared accounts.  The outcome of the April 2009 Meeting was that the U.S. taxpayer-client opted to empty his undeclared account at R+B of its assets by slowly moving the assets out of Switzerland to Canada and Hong Kong.

e.    In or about August 2009, as a result of the investigation of UBS, Dunki, Paltzer, and others known and unknown, took steps to further conceal the undeclared assets of several U.S. taxpayer-clients at R+B by using these assets to purchase gold and other precious metals; causing the gold, other precious metals, and cash to be transferred into newly opened

escrow accounts at R+B in Paltzer's name; and then depositing the gold, other precious metals, and cash into a vault rented at UBS, where they were kept for the benefit of the U.S. taxpayer-clients.

f.   On or about May 6, 2010, Dunki had gold coins delivered to Paltzer to store at a vault at UBS for the benefit of a U.S. taxpayer-client.

(Title 18, United States Code, Section 371.)

*Audrey Strauss*

_____
AUDREY STRAUSS
United States Attorney

11

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

**UNITED STATES OF AMERICA**

**- v. -**

**RAHN+BODMER CO.,**

**Defendant.**

**INFORMATION**

21 Cr.

(18 U.S.C. § 371.)

AUDREY STRAUSS
United States Attorney.

Exhibit C

**Exhibit C to Deferred Prosecution Agreement with Rahn+Bodmer Co.**

**Statement of Facts**

The following Statement of Facts is incorporated by reference as part of the Deferred Prosecution Agreement (the "Agreement") between the United States Attorney's Office for the Southern District of New York ("USAO"), the United States Department of Justice Tax Division, and Rahn+Bodmer Co. ("R+B"). The parties agree and stipulate that the following information is true and accurate:

## I.      Background

Founded in 1750, R+B is currently the oldest private Swiss bank. R+B is a partnership, consisting of five general partners who have both managerial and client service responsibilities, as well as limited partners. During the relevant period, R+B employed approximately 183 employees and operated in a single location in Zurich, Switzerland. At all relevant times, as part of R+B's business, R+B provided private banking and asset management services to citizens and residents of the United States ("U.S. taxpayers"), including U.S. taxpayers in the Southern District of New York. As of December 31, 2012, R+B held approximately $13.4 billion in assets under management. Between in or about 2004 and in or about 2012, R+B served approximately 512 U.S. taxpayers. In 2008, the number of U.S. taxpayers R+B served reached its peak of approximately 382.

## II.      The Offense Conduct

### Overview

From at least in or about 2004 through in or about 2012, R+B helped certain U.S. taxpayers with accounts at R+B ("U.S. taxpayer-clients") evade their U.S. tax obligations, file false federal tax returns with the Internal Revenue Service (the "IRS"), and otherwise hide accounts held at R+B from the IRS (hereinafter, "undeclared accounts"). R+B did so by opening and maintaining undeclared accounts for U.S. taxpayers at R+B, and by allowing third-party asset managers to open undeclared accounts for U.S. taxpayers at R+B. R+B also assisted certain U.S. taxpayers with exiting the bank in a manner that allowed them to further conceal their undeclared accounts from the IRS. R+B held undeclared accounts on behalf of approximately 340 U.S. taxpayers who collectively evaded approximately $16.4 million in U.S. taxes between in or about 2004 and in or about 2012. In furtherance of a scheme to help U.S. taxpayers hide assets from the IRS and evade taxes, R+B undertook, among other actions, the following:

- R+B opened "numbered" or "pseudonym" accounts for approximately 135 U.S. taxpayer-clients. For these accounts, the bank agreed not to identify the U.S. taxpayers by name on bank documents, but rather to identify the U.S. taxpayers by a pseudonym or number, in order to reduce the risk that U.S. tax authorities would learn the identities of the U.S. taxpayers. R+B understood that a reason that U.S. taxpayers sought these accounts was to evade detection by U.S. tax authorities.

- R+B opened and maintained accounts for 174 U.S. taxpayer-clients in the names of non-U.S. corporations, foundations, trusts, or other legal entities (collectively, "structures"), thereby helping those U.S. taxpayers conceal their beneficial ownership of the accounts. Some of the structures had no business purpose, but rather, existed solely for the purpose of helping R+B's U.S. taxpayer-clients hide their offshore assets from U.S. tax authorities ("sham structures").

- R+B agreed to hold bank statements and other mail relating to accounts of approximately 92 U.S.-domiciled taxpayer-clients at R+B's office in Switzerland, rather than send them to the U.S. taxpayer-clients in the United States, which helped ensure that documents reflecting the existence of the accounts remained outside the United States and beyond the reach of U.S. tax authorities.

- R+B allowed U.S. taxpayer-clients and third-party asset managers to make withdrawals by check from undeclared accounts in amounts of less than $10,000, in an apparent attempt to conceal transactions from U.S. authorities.

- R+B offered its clients stored-value debit cards issued by an independent service provider.  These debit cards allowed U.S. taxpayer-clients to use the funds in the undeclared accounts.

- After Liechtenstein and the United States signed a Tax Information Exchange Treaty ("TIEA") in December 2008, under which Liechtenstein agreed to provide the United States with access to certain bank and other information needed to enforce U.S. tax laws, R+B transferred the undeclared assets of certain U.S. taxpayer-clients from accounts held in the names of sham foundations organized under the laws of Liechtenstein to new accounts held in the names of new sham foundations organized under the laws of Panama in an effort to further conceal the U.S. taxpayer-clients' accounts from U.S. tax authorities.

- Following the public announcement of the UBS AG ("UBS") deferred prosecution agreement with the United States Department of Justice in February 2009, R+B opened on behalf of a Swiss attorney "escrow" accounts to facilitate the transfer of undeclared assets of U.S. taxpayer-clients that had been converted to gold and other precious metals held in a vault at UBS.

- R+B allowed several U.S. taxpayer-clients to make deposits into undeclared accounts through intermediaries.

- On occasion, R+B opened accounts for U.S. taxpayer-clients who were exiting UBS and other Swiss banks, and allowed these U.S. taxpayer-clients to continue to conceal their undeclared assets at R+B.

- R+B helped U.S. taxpayer-clients to repatriate funds to the United States in a manner designed to ensure that U.S. tax authorities did not discover the undeclared accounts,

2

including by transferring the funds of one U.S. taxpayer-client in increments of approximately $100,000 to another Swiss bank before the U.S. taxpayer-client routed the funds to a diamond dealer in Manhattan, where the U.S. taxpayer-client ultimately received them.

- R+B, through its bankers, made regular visits to the United States to solicit, open, and service undeclared accounts of U.S taxpayer-clients.

<u>R+B's Internal Policies Relating to U.S. Business and Examples of Contacts with U.S. Clients</u>

R+B has never had branches, subsidiaries, affiliates, or operations in the United States. R+B, however, took various steps to service clients based in the United States, including in the Southern District of New York, and to assist U.S. taxpayers in maintaining undeclared accounts.

R+B bankers served as the primary contact persons for R+B's U.S. taxpayer-clients or their intermediaries. Within R+B's private banking operation in Switzerland, between in or about 2004 and in or about 2012, an R+B General Partner (the "R+B General Partner") and an R+B client advisor ("Client Advisor-1") recruited and managed U.S. taxpayer-client accounts. They made regular visits to the United States, including New York, New Jersey, and Florida, to service U.S. taxpayer-client accounts.

Prior to 2009, R+B's policies permitted R+B's bankers to travel to the United States to service United States-based R+B clients. After R+B banned travel to the United States, R+B continued to service clients based in the United States.

On numerous occasions, U.S. citizens traveled from the United States to Switzerland to open undeclared accounts. R+B bankers met with these clients at R+B in Switzerland, made copies of their U.S. passports, and opened new undeclared accounts for them.

Client Advisor-1 assisted certain U.S. taxpayer-clients with transferring undeclared assets within R+B, and later into precious metals, in an effort to further conceal the U.S. taxpayer-clients' ownership of the assets. The accounts of these U.S. taxpayer-clients initially were held at R+B in the names of sham foundations organized under the laws of Liechtenstein. On or about December 8, 2008, Liechtenstein and the United States signed the TIEA, under which Liechtenstein agreed to provide the United States with access to bank and other information needed to enforce U.S. tax laws. As a result of the TIEA, and to prevent the U.S. tax authorities from discovering his U.S. taxpayer-clients' undeclared accounts at R+B, Client Advisor-1 agreed with a Swiss attorney (the "Swiss Attorney") and others to transfer the funds out of these accounts at R+B, into new – less likely to be discovered – accounts at R+B held in the names of sham Panamanian companies.

Following the public announcement of the UBS deferred prosecution agreement in February 2009, Client Advisor-1 and the Swiss Attorney agreed to further conceal the undeclared assets of these same U.S. taxpayer-clients by purchasing gold and other precious metals with the funds in the undeclared R+B accounts. In or about August 2009, the Swiss Attorney opened multiple "escrow" accounts at R+B in his own name. The gold and precious metals were then

transferred from the undeclared accounts to the escrow accounts and held in a vault rented at UBS. Client Advisor-1 took these actions to diminish the possibility that the IRS would discover the U.S. taxpayer-clients' undeclared accounts at R+B. Client Advisor-1 performed this service for at least seven U.S. taxpayer-clients and opened and managed undeclared accounts, including accounts in the names of sham structures, for at least nine U.S. taxpayer-clients.

The Qualified Intermediary Agreement

In 2001, R+B entered into a Qualified Intermediary Agreement ("QI") with the IRS. The QI regime provided a framework for non-U.S. financial institutions to report information relating to U.S. source income, including U.S. securities, and arrange for tax withholding. The QI was designed to help ensure that, with respect to U.S. source income held in an account at R+B, non-U.S. persons were subject to the proper U.S. withholding tax rates and that U.S. persons were properly paying U.S. tax on U.S. source income. Under the QI, R+B was generally obligated to identify and document any accounts that held U.S. source income by collecting either an IRS Form W-9[1] for U.S. persons or IRS Form W-8BEN[2] or equivalent documentation for non-U.S. persons. Where account holders did execute a Form W-9, R+B provided a copy of that form to its U.S. custodian, even if the account holder did not, in fact, ultimately purchase U.S. securities.

From the effective date of its QI in 2001, R+B exceeded for certain accounts the reporting obligations imposed under the QI. For clients who had provided R+B with a Form W-9, R+B caused to be reported on a Form 1099 not only the U.S.-source income-related information required under the QI, but also all dividend and interest income as well as sales proceeds generated by the assets in the accounts ("Full 1099 Reporting"), without regard to whether the income or proceeds came from U.S. or non-U.S. sources.

R+B's Awareness of U.S.Taxpayer Obligations Under U.S. Law and<br>Its Assistance of U.S.Taxpayer-Clients in Evading U.S. Taxes

At all relevant times, R+B was aware that it was a crime under U.S. law for U.S. taxpayers to evade paying taxes and for R+B to assist them in doing so. R+B knew that certain U.S. taxpayer-clients were maintaining undeclared accounts at R+B in order to evade their U.S. tax obligations, in violation of U.S. law. R+B knew this, in part, because significant numbers of U.S. taxpayers opened pseudonym and numbered accounts, entered into hold-mail agreements when they opened their accounts, employed sham structures to hold their accounts, and relayed concerns to R+B client advisors regarding their accounts being detected by the IRS.

R+B was aware that U.S. taxpayers had a legal duty to report to the IRS, and pay taxes on the basis of, all of their income, including income earned and held in accounts that these U.S. taxpayers maintained at R+B. Despite being aware of the U.S. taxpayers' legal duty, R+B opened and maintained undeclared accounts for these taxpayers and knew that, by doing so, R+B

---

[1] The IRS Form W-9 is a tax form that identifies an individual as a U.S. taxpayer for U.S. tax purposes.

[2] The IRS Form W-8BEN is a tax form that identifies the foreign status of non-U.S. persons for U.S. tax withholding purposes.

was helping these U.S. taxpayers violate their legal duties.  R+B was aware that this conduct violated U.S. law.

R+B understood the legal prohibitions regarding tax evasion to be distinct from R+B's obligations under its QI.  R+B allowed U.S. persons to open undeclared accounts using sham structures until at least in or about December 2008.

Efforts to Help U.S. Taxpayers Avoid Being Identified to the IRS<br>
Pursuant to R+B's QI Obligations

R+B allowed U.S. taxpayer-clients to use account features that would reduce the risk of U.S. tax authorities learning the identities of the U.S. taxpayers who maintained undeclared accounts.

One such feature, as previously mentioned herein, was numbered and pseudonym accounts, which R+B made available to all customers regardless of nationality or domicile.  The name of the account holder would not appear on any correspondence, account statements, communications, or notices.  Between in or about 2004 and in or about 2012, R+B maintained numbered and pseudonym accounts for approximately 135 U.S. taxpayer-clients.

In addition, R+B provided hold-mail service, which was available to customers regardless of nationality or domicile.  For U.S.-domiciled customers, the hold-mail service ensured that account statements, notices, or other documents associated with the account would not be sent to the customer's address in the United States.  The customer's mail would remain at R+B.  Between in or about 2004 and in or about 2012, R+B maintained accounts for approximately 92 U.S.-domiciled U.S. taxpayer-clients with hold-mail service agreements.

R+B understood that one reason that U.S. taxpayer-clients requested that R+B open numbered and pseudonym accounts and entered into hold-mail agreements was to facilitate tax evasion.

R+B also opened and maintained accounts on behalf of 174 U.S. taxpayer-clients in the names of non-U.S. structures, including sham structures.  R+B treated these non-U.S. structures as the account holders, and accordingly did not require the submission of Forms W-9 for these accounts.  R+B client advisors understood that these structures could be used for tax evasion.  R+B bankers' knowledge that the accounts at issue were actually owned by U.S. taxpayers was demonstrated by a particular form in the account opening documents ("Form A") that was required to be maintained by Swiss banks under Swiss banking regulations and that set forth the true beneficial owners of the accounts in question. These Forms A often identified U.S. taxpayers with addresses in the United States as the true beneficial owners of the accounts.

R+B account holders, including U.S. customers, requested checks from their undeclared accounts at R+B in amounts less than $10,000 in an apparent attempt to conceal transactions from U.S. authorities.  R+B was generally aware that U.S. taxpayer-clients requested funds be sent in multiple checks broken down in smaller amounts in an apparent attempt to evade U.S. reporting requirements.

5

Certain U.S. taxpayer-clients of R+B used the U.S. mails, private or commercial interstate carriers, or interstate wire communications to submit individual federal income tax returns to the IRS that were materially false and fraudulent in that these returns failed to disclose the existence of such taxpayers' undeclared accounts or the income held or earned in such accounts.

Individual R+B bankers understood that the Swiss banking system, including R+B, was helping U.S. taxpayers evade paying taxes to the IRS, and that R+B, by offering services like numbered and pseudonym accounts and hold-mail agreements, was assisting U.S. taxpayers in their tax evasion.

<u>The R+B General Partner Assisted U.S. Taxpayers In Evading U.S. Taxes</u>

Before in or about 2008, the R+B General Partner made regular trips to the United States to open and service undeclared accounts of U.S. taxpayer-clients.

All travel by R+B bankers to the United States ceased in or about 2008, after it had become public knowledge that UBS was under investigation for assisting U.S. taxpayers with evading taxes. However, even after UBS entered into a deferred prosecution agreement for assisting U.S. taxpayers in evading income tax, the R+B General Partner continued to assist U.S. taxpayer-clients in concealing their undeclared accounts from the IRS.

From at least in or about 2000 through in or about 2010, a U.S. taxpayer-client ("U.S. Taxpayer-Client-1") held an undeclared account at R+B with the knowledge and assistance of the R+B General Partner. The R+B General Partner met with U.S. Taxpayer-Client-1 regarding his undeclared account in the United States and recommended that U.S. Taxpayer-Client-1 retain a Swiss attorney to further assist him in connection with his undeclared account. The Swiss Attorney set up two trusts for U.S. Taxpayer-Client-1 to further conceal his undeclared accounts at R+B.

On or about April 29, 2009, the R+B General Partner, U.S. Taxpayer-Client-1, and the Swiss Attorney met in Switzerland (the "April 2009 Meeting"). The purpose of the April 2009 Meeting was to discuss the future of U.S. Taxpayer-Client-1's undeclared accounts at R+B, in light of the public news that UBS had been investigated by United States law enforcement authorities for helping U.S. taxpayers maintain undeclared accounts. The substance of the discussion during the April 2009 Meeting was documented through a contemporaneous memorandum and reflects that multiple options were discussed. Although the Swiss Attorney and the R+B General Partner presented entry into the IRS's Offshore Voluntary Disclosure Program as an option, U.S. Taxpayer-Client-1 rejected this option in favor of incrementally transferring the undeclared assets out of Switzerland. As a result of this decision, which was discussed with the R+B General Partner, U.S. Taxpayer-Client-1 transferred at least a portion of the undeclared assets to an account maintained by another individual in Hong Kong.

The R+B General Partner also assisted another U.S. taxpayer-client ("U.S. Taxpayer-Client-2") with concealing his undeclared account at R+B from both the IRS and his ex-wife.

During the opening of the account, the R+B General Partner assured U.S. Taxpayer-Client-2 that his account at R+B would be maintained in accordance with Swiss bank secrecy law. The R+B General Partner suggested that, to ensure the nondisclosure of the account, any withdrawals should be in increments of less than $10,000 to avoid scrutiny from the U.S. bank, and, later, that U.S. Taxpayer-Client-2 should no longer hold U.S. securities in his account.

In or about 2009, after U.S. Taxpayer-Client-2 had learned of the UBS investigation, the R+B General Partner informed U.S. Taxpayer-Client-2, in response to a question, that Swiss secrecy laws were not changing and R+B would not disclose U.S. Taxpayer-Client-2's name to the U.S. authorities. According to the R+B General Partner, R+B was a stable, 100-year-old family business that would not be affected by the UBS investigation. In or about March 2010, however, with the assistance of the R+B General Partner, U.S. Taxpayer-Client-2 transferred the remaining assets in his undeclared account at R+B to a new undeclared account at an Israeli bank headquartered in Ramat Gan, Israel.

<u>R+B's Efforts To Wind Down Its U.S. Business in Response to the UBS Investigation</u>

Prior to the UBS investigation, as discussed above, R+B implemented expansive reporting under the QI for clients that had agreed to sign a Form W-9. In early 2008, U.S. enforcement actions against UBS became public. In or about July 2008, UBS announced that it would cease providing cross-border private banking services to U.S.-domiciled clients. Instead of immediately closing down its own U.S. taxpayer-clients' undeclared accounts as a result of the UBS investigation, R+B continued to service undeclared accounts and assisted U.S. taxpayer-clients exiting the bank with continuing to conceal their assets from the IRS.

However, in response to the UBS investigation, R+B began implementing a number of measures that gradually imposed limitations on accounts held by U.S. taxpayer-clients. At first, in or about August 2008, R+B limited account openings for entities to instances where the entity had been formed before the opening of the account. In or about March 2009, R+B instituted an "Exit Policy" for U.S-related accounts, including accounts of non-U.S. entities with U.S. beneficial owners. Under this policy, all such accounts were required to provide Forms W-9 or face closure by specified deadlines. For accounts with over $500,000 on deposit, however, no deadline for closure was set. Instead, higher-value accounts were encouraged to enter into the IRS's Offshore Voluntary Disclosure Program. Many clients did so, and many of those who did not, such as U.S. Taxpayer-Client-1, were asked to leave the bank. Still, by the end of 2012, there remained approximately 58 U.S. taxpayer-clients without a Form W-9. By 2014, two clients with a U.S. nexus (both non-U.S.-domiciled) remained beneficial owners of non-U.S. entity accounts at R+B without a Form W-9, and 11 clients with a U.S. nexus (9 non-U.S.-domiciled) remained beneficial owners of individual accounts at R+B without a Form W-9.

In 2008, R+B opened accounts for nine U.S. taxpayer-clients who had previously held accounts at UBS. In 2009, R+B opened accounts for one U.S. taxpayer-client who had previously held an account at Credit Suisse, and for one U.S. taxpayer-client who had previously held an account at Julius Baer. R+B collected Forms W-9 from these clients and/or closed the accounts only in later years pursuant to its Exit Policy.

<u>The Impact of Undeclared Accounts on R+B's Assets under Management, Fees, and Profits</u>

R+B's conduct with regard to undeclared accounts allowed it to increase the undeclared U.S. taxpayer-client assets that it held, thereby increasing its fees and profits.  The assets under management that R+B held for undeclared U.S. taxpayer-clients increased from approximately $391 million in 2004 to approximately $550 million in 2007, its peak year for undeclared assets under management.

In total, R+B assisted approximately 340 U.S. taxpayer-clients with undeclared accounts, including accounts held through structures, who collectively evaded what has been approximated at $16.4 million in U.S. taxes between in or about 2004 and in or about 2012.  R+B earned approximately $9.7 million in gross revenues from these undeclared U.S. taxpayer-client accounts, including accounts held through structures.

R+B agrees to pay $4,900,000 in restitution, $9,700,000 in forfeiture, and a fine of $7,400,000, for a total of $22,000,000, for the tax years 2004 through 2012, as result of the conduct described herein.

8

Exhibit D

AUDREY STRAUSS
United States Attorney for the
Southern District of New York
By:  OLGA I. ZVEROVICH
     Assistant United States Attorney
     One St. Andrew's Plaza
     New York, New York 10007

STUART M. GOLDBERG
Acting Deputy Assistant Attorney General for Criminal Matters
United States Department of Justice Tax Division
By:  ELLEN QUATTRUCCI, Trial Attorney
     150 M Street, N.E.
     Washington, DC 20002


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,            :

                Plaintiff,           :        <u>VERIFIED COMPLAINT</u>

           -v.-                      :        21 Civ. ____

$9,700,000 IN UNITED STATES          :
CURRENCY,
                                     :
                Defendant *in rem*.
- - - - - - - - - - - - - - - - - -x

     Plaintiff United States of America, by its attorneys,

AUDREY STRAUSS, United States Attorney for the Southern District

of New York, and STUART M. GOLDBERG, Acting Deputy Assistant

Attorney General for Criminal Matters for the United States

Department of Justice Tax Division, for its Verified Complaint

(the "Complaint") alleges, upon information and belief, as

follows:

2

## I.   JURISDICTION AND VENUE

1.   This action is brought by the United States of America pursuant to 18 U.S.C. § 981(a)(1)(C), seeking the forfeiture of $9,700,000 in United States Currency (the "Defendant Funds").

2.   This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345 and 1355.

3.   Venue is proper pursuant to 28 U.S.C. § 1355(b)(1)(A) because acts and omissions giving rise to the forfeiture took place in the Southern District of New York.

4.   The Defendant Funds constitute proceeds of mail and wire fraud, and are thus subject to forfeiture to the United States pursuant to Title 18, United States Code, Section 981 (a)(1)(C).

## II.   NATURE OF THE ACTION

5.   As alleged in *United States* v. *Rahn+Bodmer Co.*, 21 Cr. _____ (the "R+B Information"), attached as Exhibit A and incorporated by reference herein), from at least in or about 2004 up through and including at least in or about 2012, Rahn+Bodmer Co. ("R+B"), a Swiss bank, conspired with others known and unknown to defraud the United States of certain taxes due and owing by concealing from the United States Internal Revenue Service ("IRS") undeclared accounts owned by U.S.

3

taxpayers at R+B.  On or about _____, the United

States Attorney's Office for the Southern District of New York

(the "Office"), the United States Department of Justice Tax

Division, and R+B entered into a deferred prosecution agreement

(the "DPA" or the "R+B DPA," attached as Exhibit B and

incorporated by reference herein).

          6.   As set forth in the Statement of Facts, attached

as an exhibit to the R+B DPA and incorporated by reference

herein, the fraud conspiracy alleged in the R+B Information

involved the use by U.S. taxpayer-clients of R+B of the U.S.

mails, private or commercial interstate carriers, or interstate

wire communications to submit individual federal income tax

returns to the IRS that were materially false and fraudulent in

that these returns failed to disclose the existence of such

taxpayers' undeclared accounts or the income earned in such

accounts.

### III.  <u>THE DEFENDANT-IN-REM</u>

          7.   Under the DPA, R+B agreed to forfeit $9,700,000.

Pursuant to the DPA, R+B transferred the Defendant Funds to the

United States in the Southern District of New York as a

substitute *res* for gross proceeds from its scheme to defraud the

United States as set forth in the R+B Information.  R+B agrees

that Defendant Funds are subject to civil forfeiture to the

4

United States pursuant to 18 U.S.C. § 981(a)(1)(C) as proceeds

of mail and wire fraud.

## IV.  <u>CLAIM FOR FORFEITURE</u>

8.    The allegations contained in paragraphs 1 through

7 of this Verified Complaint are incorporated by reference

herein.

9.    Title 18, United States Code, Section

981(a)(1)(C) subjects to forfeiture "[a]ny property, real or

personal, which constitutes or is derived from proceeds

traceable to a violation of . . . any offense constituting

'specified unlawful activity' (as defined in section 1956(c)(7)

of this title), or a conspiracy to commit such offense."

10.    "Specified unlawful activity" is defined in 18

U.S.C. § 1956(c)(7) to include any offense under 18 U.S.C.

§ 1961(1).  Section 1961(1) lists as offenses both mail fraud

(18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343).

5

11.   By reason of the above, the Defendant Funds are subject to forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C).

Dated:      New York, New York
            March _____, 2021

                            AUDREY STRAUSS
                            United States Attorney for
                            Plaintiff United States of America


            By: _____

                            OLGA I. ZVEROVICH
                            Assistant United States Attorney
                            One St. Andrew's Plaza
                            New York, New York 10007
                            (212) 637-2514


                            STUART M. GOLDBERG
                            Acting Deputy Assistant Attorney
                            General for Criminal Matters for
                            Plaintiff United States of America


            By: _____

                            ELLEN QUATTRUCCI
                            Trial Attorney
                            (202) 514-9370

VERIFICATION

STATE OF NEW YORK              )
COUNTY OF NEW YORK             :
SOUTHERN DISTRICT OF NEW YORK  )

ERIC JONKE, pursuant to Title 28, United States Code, Section 1746, hereby declares under penalty of perjury that he is a Special Agent with the Internal Revenue Service, Criminal Investigation; that he has read the foregoing Verified Complaint and knows the contents thereof; that the same is true to the best of his knowledge, information and belief; and that the sources of his information and the grounds of his belief are his personal involvement in the investigation, and conversations with and documents prepared by law enforcement officers and others.

_____
Eric Jonke
Special Agent
Internal Revenue Service,
Criminal Investigation

Dated: